BANK OF BRULE, APPELLEE, v. ROBERT F. HARPER ET AL., APPELLANTS.

4 N. W. (2d) 609

FILED JUNE 19, 1942. No. 31396.

618

E. H. Evans and G. F. Nye, for appellants.

Beatty, Maupin, Murphy & Derry, contra.

Heard before ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

The plaintiff seeks to impress a trust upon proceeds realized from the sale of certain property by virtue of condemnation thereof. The corporate capacity of the plaintiff is admitted, and that it recovered a judgment on October 18, 1938, in the county court of Keith county against the defendants, A. O. Harper and his father, Robert F. Harper. Filena Harper, commonly known as Lena, not a party to the notes, is the wife of Robert F. and the mother of A. O. Harper. The judgment was transcripted to the district court. That the notes sued on, dated February 25, 1936, were renewals of previous indebtedness of A. O. Harper and Robert F. Harper and merged into the judgment is admitted.

The petition then alleged certain facts disclosing the transaction had between the husband and wife, wherein they confederated to cheat, defraud and delay the judgment creditor in the collection of its claim against the husband. We will not set forth the facts as pleaded in the petition, but those so pleaded relevant and material to a decision of this case will be found in the summary of the evidence. The ka Public Power and Irrigation District instituted condemnation proceedings against the real estate and leasehold petition further alleged: During 1938 the Central Nebrasinterest therein and the buildings and improvements thereon, resulting in an award in favor of Lena Harper and Robert F. Harper in the sum of $1,900. Thereafter, Lena Harper, claiming to be the owner of all of said property and the leasehold interest, filed a petition on appeal, claiming to be the sole and unconditional owner thereof; that said action

was taken on her part in furtherance of a scheme and plan between her and her husband to divert and deceive the creditors of Robert F. Harper.

The prayer was for a temporary restraining order, to restrain defendants from disposing of moneys received from condemnor until such time as the action may be determined; that a decree be entered, setting aside the conveyance of said leasehold interest, finding and determining that the property was, in fact, the property of Robert F. Harper and subject to payment of plaintiff's judgment, and for general equitable relief.

In its decree the court found generally in favor of the plaintiff and against the defendants and each of them; that defendant Robert F. Harper, at the time he was indebted to the plaintiff, attempted to transfer all his property to his wife, for the purpose of placing it beyond the reach of his creditors, including the plaintiff; that such transfers were without consideration; that Lena Harper, from time to time, changed the form of the property so transferred to her; found that there was due and owing the plaintiff from Robert F. and A. O. Harper the sum of $1,224.92, and that Lena Harper, by reason of the transfer of the property to her and subsequent uses and changes thereof, attempted to enhance her personal estate, and that plaintiff is entitled to a judgment against Lena Harper personally for the amount due it. Lena Harper was restrained and enjoined from disposing of a part of the money, viz., $1,500, paid to her by the condemnor; this money to satisfy plaintiff's judgment in the event it became final and conclusive. Motion for a new trial was overruled, and defendants have appealed to this court.

The record discloses: In October, 1925, Herman E. Fairchild leased certain property to Thomas Eggers for the purpose of operating and maintaining a general merchandise store, filling station, garage, dwelling-house and buildings connected therewith. The property leased was a parcel or strip of land lying in the southwest quarter of the southwest quarter of section 6, township 15, range 40, in Keith county,

Nebraska. An assignment of this lease was made to A. O. Harper in 1927 and to Lena Harper in 1928, these assignments not appearing as such in the record. In 1928 A. O. Harper operated the store on the premises known as the Belmar store, and during the year he traded the stock of merchandise, fixtures, equipment and business to his father and mother for some live stock owned by his mother; the elder Harpers moving from a farm to operate and manage the store, and the son moving to the farm to carry on farming operations. When this exchange was made the original indebtedness to the plaintiff occurred, Robert F. Harper receiving a part of the money loaned to A. O. Harper, and signing as surety on the note. The indebtedness was renewed at different times, and the father signed the renewal notes as surety. During the time of the indebtedness, Robert F. Harper made certain financial statements to the plaintiff, which may be briefly summarized as follows:

February 21, 1931, he stated he was the owner of a stock of general merchandise, valued at $2,000; 160 acres of land, valued at $16,000, encumbered for $8,000; bills receivable, $500; accounts payable, $50, and declared he had no partners in the business. March 2, 1932, the statement was practically the same, but there appeared one item—notes indorsed for friends $2,017.95. A similar financial statement of June 22, 1933, showed indebtedness of A. O. Harper, $2,130. Another financial statement of February 17, 1934, was of the same nature as the others. The testimony of Robert F. Harper indicates some question as to whether he signed some of the financial statements. His signature, however, appears on them.

May 7, 1934, Robert F. Harper executed a bill of sale, transferring to his wife, Lena Harper, all of his title and interest in the store. Some question is raised about the notary's commission covering a period of more than six years from the date of execution and acknowledgment of the bill of sale on May 7 and the expiration date of the commission. Explanation of this discrepancy is attempted, and the true situation in this connection is not revealed in the record.

Lena Harper, acting under the bill of sale, took over the complete management and operation of the store. The bank account of Robert F. Harper was terminated, he having no further interest in the business. However, subsequent to the execution of the bill of sale, other financial statements were made by Robert F. Harper to the plaintiff. One dated June 18, 1934, showed stock of general merchandise, $1,400; store accounts due, $600; a sum of money borrowed from one Carl Beard; notes indorsed for friends, $2,216; bills receivable, $800, and a 5,000-dollar encumbrance on real estate. Another statement, dated December 15, 1934, showed cash on hand, $100; merchandise, $1,400; bills receivable, $250; accounts receivable, $500; bills payable, $350; open accounts payable, $100; town real estate, $1,500; country real estate, $7,500, and listing live stock. This statement also showed Harper to be a joint signer with A. O. Harper on paper at plaintiff bank, and a mortgage on country real estate of $5,000. He recited the cost of a store building in the sum of $1,600.

Nearly four years after the bill of sale was executed, Lena Harper wrote to the county clerk, stating that she was enclosing the bill of sale of the merchandise; that she wanted it filed away for safe-keeping, and for him to let her know if there was any fee connected with it. The record shows a note in the sum of $325, dated December 15, 1934, due January 15, 1936, signed by Robert F. Harper, for the purchase of scales placed in front of the store at Belmar; in addition, 12 checks, showing payments on the scales from January 14, 1935, to January 15, 1936, varying in amounts from $25.38 to $27.45, all signed by Lena Harper.

On June 29, 1934, Robert F. Harper surrendered a policy of insurance in which his wife Lena was named beneficiary. He received $651.55 cash surrender value and a guaranteed additional sum of $312, or a total of $963.55, paid direct to him. This amount and the sum of $219.70 on Robert F. Harper's bank account were turned over to Mrs. Harper, making a total of $1,183.25. The cost of the new store building was: Material, $1,247.20; labor, approximately $240,

and an additional $48, totaling $1,535.20, the labor being paid mostly with grocery orders at the store. The insurance money was used in the purchase of material and for the building of the store.

May 7, 1938, Clarence Fairchild leased to Lena Harper a tract of land, adjoining U. S. highway No. 26 on the south side, located in the southeast quarter of section 1, township 15, range 41, Keith county; the lease to run until May 7, 1958, payable $5 annually on October 1. The new store building was built on land distinct from that shown in the original lease; in fact, 300 feet west thereof. During the four-year interim there appears to have been an oral lease, and the amounts paid by Lena Harper are shown by receipts containing the same language, covering annual rental periods from October 1, 1934, to and including October 1, 1940. These receipts are all in the same handwriting, apparently written with the same pencil, all folded alike, and appear to have been made at about the same time.

In the fall of 1934, when the new store was completed, the stock of merchandise, one show case, candy scale and household goods were moved from the old location to the new. The transfer of merchandise and business, evidenced by the bill of sale, and the proceeds from the insurance policy were to reimburse Lena Harper for money she had received from her father's estate, he having departed this life in 1916, and she having converted all the property received from his estate into cash by 1921. The record contains a check, dated November 20, 1917, to her in settlement of her interest in the estate, in the sum of $702.02. Most of the money she received from her father's estate was put into land, and she testified that it was used for the benefit of the family. The amount of her interest in the estate is not definitely shown, and there is no written evidence of any kind or nature disclosing what amount of money, if any, her husband owed her. She kept no account of any indebtedness, but concluded the amounts she received from him would apply, as far as they would go, indicating that he might have owed her more than he had turned over to her.

The title to the land was in the husband's name; the personal property for assessment purposes was in the wife's name; she made the tax returns and made no returns showing any indebtedness owing by him to her. When the bill of sale was made, the mortgagee was pressing for an adjudication of the mortgage. Subsequently, the mortgage was foreclosed and the sale of the land confirmed, disposing of the defendant's interest therein.

In 1935 defendant Robert F. Harper was operated upon for appendicitis, suffered from pernicious anemia and has since remained under the care of a physician. He was 68 years of age and his wife 66 years. From the time of operating the Belmar store, he was also postmaster, received rent for the space in the store, and retained this position until at least 1940, when they removed from the premises, due to the condemnation proceedings in 1938 brought by the power and irrigation district on the real estate and leasehold interest therein, resulting in an award in favor of the defendants Lena and Robert F. Harper in the sum of $1,900. Thereafter Lena Harper, claiming to be the sole owner of the leasehold, appealed, and the condemnor paid her $5,000 in money in full satisfaction of her claim.

The foregoing constitute the material facts upon which the plaintiff bases its right of recovery.

The defendants predicate error on the refusal of the court to sustain defendants' motion to dismiss the case at the close of all the evidence. Defendants' contention is that the plaintiff seeks to subject a portion of the proceeds of the judgment obtained by Lena Harper in the condemnation proceedings to the satisfaction of a judgment obtained by this plaintiff against Robert F. Harper, wherein Lena Harper was in no sense a party; that Robert F. Harper never had an interest in the property leased to Lena, calling attention to the lease from Clarence Fairchild to Lena, dated May 7, 1938, and heretofore referred to in the summary of the evidence; that this lease was recorded May 9, 1938; that Lena Harper paid the rent and received the receipts therefor in her name; that the $5,000 paid to her was for the loss

of the land, and that nothing was said about the building. The following proposition of law is cited by the defendants:

A suit by a judgment creditor to receive assets of his debtor, not reachable by execution, can be maintained only where the debtor himself had an actionable demand at the time the suit was instituted. It is contended that plaintiff's petition does not disclose that Robert F. Harper had an actionable demand against the Central Nebraska Public Power and Irrigation District on October 7, 1940; that Robert F. Harper had disposed of and turned over all his interest of every kind and nature in a leasehold on property in section 6, as heretofore described; that the leasehold condemned was not in section 6 but in section 1, a separate, distinct and different lease; that, therefore, Robert F. Harper, judgment debtor, had no actionable demand in the parcel of land in section 1—citing *German Nat. Bank v. First Nat. Bank,* 55 Neb. 86, 75 N. W. 531; *Id.,* 59 Neb. 7, 80 N. W. 48.

The allegations of plaintiff's petition constitute an action in the nature of a creditor's bill, where the property of a debtor is followed into the hands of another and is obligated to the payment of the debtor's obligations; the petition does not plead the requisites of a case in aid of execution. In cases of this nature, this court has time and again announced the rule that a conveyance of property by a husband to his wife is presumptively fraudulent as to existing creditors and will be set aside unless the good faith of the transaction be established by a preponderance of the evidence. *Farmers Elevator Co. v. Peck,* 134 Neb. 305, 278 N. W. 499; *Riggs v. Hroch,* 133 Neb. 260, 274 N. W. 598.

"A conveyance between relatives which has the effect of hindering or delaying a creditor in the collection of his claim is presumptively fraudulent and, in litigation between the creditor and the parties to the conveyance over its alleged invalidity, the burden is on the parties to the conveyance to establish the good faith of the transaction." *McBride v. Helmricks,* 140 Neb. 843, 2 N. W. (2d) 118. See, also, *Lincoln Savings & Loan Ass'n v. Mann,* 129 Neb. 26,

260 N. W. 559; *Christensen v. Smith,* 123 Neb. 388, 243 N. W. 118; *Lincoln Trust Co. v. Sweeney,* 124 Neb. 686, 248 N. W. 67.

In *Arlington State Bank v. Paulsen,* 57 Neb. 717, 78 N. W. 303, this court said (p. 734) : "It has always been one of the powers possessed by courts of equity to compel the application of a debtor's unexempt property to the payment of his debts when the creditor had no other means of redress; * * * In other words, when all other remedies have failed, a court of equity will, at the suit of a creditor, take the unexempt property of a debtor wherever found, in whatever condition it may be, and cause it to be applied towards the payment of his debt."

In *Hilton v. Clements,* 137 Neb. 791, 291 N. W. 483, it was said in the body of the opinion: "The question of fraudulent intent is a question of fact and not of law, when considered in the matter of an assignment charged to be made to hinder and delay creditors. When the testimony relied upon to show good faith is given by interested relatives only, the reasonableness or unreasonableness of their evidence has considerable weight in arriving at a just conclusion."

An analysis of the evidence shows that the indebtedness to the bank was a prolonged, continuous indebtedness, of which the husband and wife were well aware. The financial statements clearly indicate a claim of ownership in the merchandise and equipment of the Belmar store in Robert F. Harper, even though his wife claimed to manage the store, took over the bank account and terminated his bank account. He was at all times available, acted in the capacity of postmaster, received rent for post office space in the store, waited on customers, and took a general interest in business matters concerning the store. The fact that the store was moved to a new location and that the lease thereof was made only to Lena Harper does not destroy the evidence of the husband's interest in the operation of the store and ownership of merchandise therein.

We conclude, under the authorities cited, and considering

the nature of the plaintiff's action, that the transfer of defendant Robert F. Harper's property, as hereinbefore set out, was fraudulent as to the judgment creditor.

We need not discuss the question of whether or not the injunction was proper under the circumstances of this case. It is not attacked by the defendants.

With reference to the question of whether or not a personal judgment may be rendered in a creditor's bill against the defendant (in this instance, Lena Harper), who was a fraudulent transferee of the debtor's property, this court in the case of *Sheldon v. Parker* (on rehearing) 66 Neb. 634, 95 N. W. 1015, held:

"Where a husband and wife confederate to defraud creditors by transferring property of the husband to the wife, * * * so that it cannot be reached by the creditors of the husband, a personal judgment may be entered against the wife * * * provided it appears, or is fairly to be presumed, that she still retains such proceeds or her separate estate has had the benefit thereof."

In the instant case, Robert F. Harper attempted to place in his wife's name all property in the Belmar store, consisting of merchandise, fixtures, accounts receivable, and the lease upon the property on which the new store was built. This property, such as it may have been at the time of the attempted transfer, cannot be identified as the property actually transferred to the wife. The stock of merchandise would, by necessity, change. The money was converted to her use in his account in the bank, was spent and replaced by other funds. While the leasehold was initially taken in her name, the first disclosure of the lease was in 1938. Prior to that time, it had been an oral lease, the evidence disclosing that the building was paid for with money obtained from the proceeds of an insurance policy of the husband. Although all of such property was subsequently changed from its original status, the evidence does show that the wife was an active participant in the fraudulent designs of her husband in attempting to escape his creditors. Her personal estate was enhanced by virtue of the carrying

on of the business in her name. The evidence does disclose that the property had a value in excess of the amount due the plaintiff, and the judgment rendered against the wife is in an amount less than she benefited through the attempted conveyance.

Defendants contend that, under the rule in condemnation proceedings, as announced in *James Poultry Co. v. City of Nebraska City*, 135 Neb. 787, 284 N. W. 273; on rehearing, 136 Neb. 456, 286 N. W. 337: "Where a leasehold has been taken or damaged for a public use, the owner is entitled to recover as compensation the difference between the value of such leasehold immediately before and immediately after the completion of the improvement from which the injury results." The opinion quotes from *Lowell v. Buffalo County*, 119 Neb. 776, 230 N. W. 842, the defendants contending that the $5,000 paid to Mrs. Harper included the leasehold interest, and the interest in the land was the sole and only subject of the condemnation. The rule is correctly stated, but it is proper to consider the nature of the business, the fixtures and equipment, and the merchandise, not as independent elements of damage, but as proper items to be considered in determining the value of the leasehold interest. See *Lowell v. Buffalo County, supra,* and *James Poultry Co. v. City of Nebraska City, supra.* The defendants' contention is without merit.

Section 44-1130, Comp. St. Supp. 1941, is cited by defendants. It provides in part: "All moneys, avails, cash values and all and every benefit accruing under * * * any policy or certificate of life insurance payable to a beneficiary other than the estate of the insured * * * *shall be exempt from attachment, garnishment or other legal or equitable process* and from all claims of creditors of the insured and of the beneficiary. * * * " (Italics ours.)

The record does not disclose the terms, conditions, rights or options contained in the insurance contract, the policy not being contained therein, except that the insured, Robert F. Harper, carried the policy for 20 years; then surrendered it, receiving the amounts heretofore noted. This he elected

to do, taking payment in his own name and terminating any and all rights his wife might have in the policy, assuming she was the beneficiary. Therefore, the proceeds in his hands would not be exempt from the claims of creditors. The statutory provision is not so all-inclusive that it covers such a situation as here presented. We quote from the syllabus in *Talcott v. Field*, 34 Neb. 611, 52 N. W. 400, as follows:

"While, ordinarily, a policy of life insurance payable to the wife upon the death of her husband is not subject to be applied in payment of his debts, yet where the policy is in the form of an endowment, a certain sum to be repaid after a specified number of years, the transaction is in the nature of a loan, the insurance being a mere incident, and where the premiums have been paid by an insolvent debtor, the insurance money on such policy received by the wife during the lifetime of the husband is not transmuted so as to be hers as against creditors of the husband, but is subject to their claims."

Considering the state of the record on this phase of the case, the statutory provision cited by defendants is not applicable.

For the reasons given in this opinion, the judgment of the trial court is

AFFIRMED.